**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1. LINSEY ACKERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: CIV-2026-144-JAR |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| 1. RED RIVER VALLEY RURAL ELECTRIC ASSOCIATION, | ) | ATTORNEY LIEN CLAIMED |
| | ) | |
| | ) | |
| Defendant. | ) | |

# COMPLAINT

The Plaintiff, Linsey Ackerman, offers the following statements in support of her claims in this action:

## PARTIES

1. The Plaintiff is Linsey Ackerman, an adult resident of Carter County, Oklahoma.
2. The Defendant is Red River Valley Rural Electric Association, a domestic corporation doing business in Love County, Oklahoma.

## JURISDICTION & VENUE

3. Plaintiff asserts claims for violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12111, *et seq*. including in the form of termination based on disability, failure to accommodate her disability, retaliation after Plaintiff opposed disability discrimination and/or retaliation for Plaintiff requesting disability accommodations.
4. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331. Most of the actions giving rise to Plaintiff's causes of action occurred in Love

County, a county within the United States Eastern District of Oklahoma such that venue is proper in this Court.

## FACTS

5. The Defendant employed at least fifteen employees during at least twenty weeks of the current or proceeding calendar year such that it is an "employer" under the Americans with Disabilities Act.
6. Plaintiff was employed by the Defendant from around March 15, 2021 until around March 6, 2025.
7. Plaintiff held the job title of Member Services Representative.
8. Plaintiff was qualified for her position and performed satisfactorily.
9. Plaintiff suffers from Autism Spectrum Disorder (ASD) and related impairments which, without the remedial effects of mitigating measures, substantially impairs Plaintiff's ability to communicate, concentrate, think, interact with others, among other major life activities.
10. As part of Plaintiff's condition, she has difficult engaging in social interactions and communicating with others. Plaintiff become deeply focused on tasks such as working on the computer and often continues to work alone instead of engaging in social interactions with co-workers.
11. Some of Plaintiff's co-workers, including Manuela Barrientos, would perceive Plaintiff's behavior as "rude". Ms. Barrientos often called Plaintiff "rude", criticized Plaintiff's interpersonal skills, called her "neurotic" and made similar

comments about Plaintiff's difficulties in communicating and interacting with others.

12. On at least one occasion, Ms. Barrientos told Plaintiff that she believed Plaintiff's daughter was "autistic" and that she (Ms. Barrientos) did not believe autistic people "deserved" to be loved because they would "never understand" what it meant to be in love.

13. Plaintiff's immediate supervisor, Yesenia Fernandes, also criticized Plaintiff for her struggles when communicating and engaging in social interaction. For instance, Ms. Fernandes would:

    a. criticize Plaintiff as rude for continuing to work on the computer instead of engaging in social conversations with her co-workers;

    b. accuse Plaintiff not being a "team player" by not interacting socially at work with her co-workers;

    c. tell Plaintiff that she made co-workers uncomfortable when she would isolate herself at work instead of engaging with her co-workers.

14. Around February 21, 2025 Ms. Barrientos began rudely criticizing the way Plaintiff was sitting in her chair and demanding Plaintiff change the way her chair faced.

15. Plaintiff became frustrated and overwhelmed by Ms. Barrientos' conduct, rising from her chair, moving her arms and leaving the location of her desk to make a complaint about Ms. Barrientos' conduct.

16. Later that day, Ms. Fernandes and Kardale Lornes (Ms. Fernandes's immediate supervisor) gave Plaintiff a written reprimand. Among other things, the written reprimand:

    a. Accused Plaintiff of creating a "negative and stressful work environment";

    b. Stated Plaintiff "Need[ed] to work on being more of a team player";

    c. Stated Plaintiff had created a "toxic work environment" by "self isolating and not working well with others or being polite/courteous to other members of the team".

17. The comments in the write-up are nearly identical to, and appear to reference, the same criticisms Ms. Fernandes made about the way Plaintiff has communicated and interacted, which are directly impaired from her medical issues.

18. Around February 27, 2025 Plaintiff's therapist sent an email to Ashley Hambrick (Defendant's HR Manager) which, among other things:

    a. explained that Plaintiff had been diagnosed with Autism Spectrum Disorder and is being treated for this condition;

    b. complained that "it is very discriminatory for an employee to be targeted by a company when they have Autism . . . for not socially responding in the workplace in a way in which someone with this disability would respond";

    c. Requested medical accommodations on Plaintiff's behalf for her Autism Spectrum Disorder.

19. Around February 28, 2025 Plaintiff was called into a meeting with Mr. Lornes and Ms. Hambrick. During the meeting:

    a. Mr. Lornes acknowledged that Plaintiff was written up for how she interacts with others and **not** based on her job performance;

    b. Mr. Lornes acknowledged that accommodations may assist Plaintiff in her employment with Defendant; and

    c. Ms. Hambrick stated that Defendant would have accommodated Plaintiff had Plaintiff requested accommodations beforehand.

20. Defendant involuntarily terminated Plaintiff's employment around March 6, 2025.

21. During the termination meeting, Mr. Lornes told Plaintiff she was terminated for her behavior including that for which she had been previously disciplined; all of which relate to how she interacts and communicates with others. According to Mr. Lornes, Plaintiff's behavior seems to be "progressing in the wrong direction".

22. As a direct result of her termination, the Plaintiff has suffered, and continues to suffer, wage loss (including back, present and front pay along with the value of benefits associated with such wages) and emotional distress/dignitary harm including worry, sadness, frustration and similar unpleasant emotions.

23. But-for reasons for Defendant's termination of the Plaintiff's employment include her disability (including an actual disability, a record of a disability and/or because Defendant regards Plaintiff as being disabled), the need to accommodate Plaintiff's medical condition, retaliation for the complaint of discrimination made

on Plaintiff's behalf and/or retaliation for the request for accommodation made on Plaintiff's behalf.

24. Plaintiff has exhausted her administrative remedies by timely filing a charge of discrimination with the EEOC around July 14, 2025. The EEOC issued Plaintiff a right to sue letter with an issuance date of February 13, 2026. This Complaint is timely filed within ninety (90) days of Plaintiff's receipt of her right to sue letter.

**COUNT I**

25. Discriminating against an employee on the basis of disability (including an actual disability, a record of a disability and/or because the employer regarded the employee as disabled), denying reasonable disability accommodations, terminating an employee based on the need to provide accommodations, and/or terminating an employee in retaliation for the employee complaining of disability discrimination and/or requesting accommodations, violates the Americans with Disabilities Act.

26. As a result of Defendant's violation of the Americans with Disabilities Act, Defendant is liable to Plaintiff for Plaintiff's wage loss (including back, present and front pay along with the value of benefits associated with such wages) and her emotional distress damages.

27. Because Defendant's conduct was willful or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is also entitled to an award of punitive damages.

28. Plaintiff also seeks all other relief allowed including reinstatement with reasonable accommodations.

**WHEREFORE,** Plaintiff respectfully prays this Court grant all legal and equitable relief allowed including wage loss, back pay, front pay, benefits, emotional distress damages, punitive damages, reinstatement, attorney fees and costs and all other relief this Court deems proper.

**RESPECTFULLY SUBMITTED THIS 12TH DAY OF MAY 2026.**

HAMMONS, HURST & ASSOCIATES

s/ Amber L. Hurst
Amber L. Hurst OBA No. 21231
325 Dean A. McGee Avenue
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-6100
Facsimile: (405) 235-6111
amber@hammonslaw.com
Jury Trial Demanded
Attorney Lien Claimed
*Counsel for Plaintiff*